1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

ONIKA FRANCES CLIFFORD,

9

Plaintiff,

10

v.

11

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

12

13

Defendant.

NO.  C13-1830-RSM-JPD

REPORT AND
RECOMMENDATION

14      Plaintiff Onika Frances Clifford appeals the final decision of the Commissioner of the

15  Social Security Administration ("Commissioner") which denied her application for

16  Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

17  §§ 1381-83f, after a hearing before an administrative law judge ("ALJ").  For the reasons set

18  forth below, the Court recommends that the Commissioner's decision be REVERSED and

19  REMANDED.

20                    I.        FACTS AND PROCEDURAL HISTORY

21      Plaintiff is a 29 year old woman with a high school education.  Administrative Record

22  ("AR") at 43.  While the ALJ found plaintiff has no past relevant work for the purposes of

23  determining SSI benefits, a review of the record indicates that her past work experience

24

includes employment as a retail sales employee and housecleaner. AR at 31, 44, 144. Plaintiff was last gainfully employed in August 13, 2010. AR at 24.

On August 13, 2010, plaintiff filed a claim for SSI payments alleging an onset date of July 1, 2008. AR at 22. Plaintiff asserts that she is disabled due to depressive disorder, anxiety disorder, and post traumatic stress disorder ("PTSD"). AR at 24, 143. The Commissioner denied plaintiff's claim initially and on reconsideration. AR at 22, 68-83. Plaintiff requested a hearing which took place on June 26, 2012. AR at 38-67. On June 29, 2012, the ALJ issued a decision finding plaintiff not disabled and denied benefits. AR at 19-37. Plaintiff's administrative appeal of the ALJ's decision was denied by the Appeals Council, AR at 1-7, making the ALJ's ruling the "final decision" of the Commissioner as that term is defined by 42 U.S.C. § 405(g). On October 10, 2013, plaintiff timely filed the present action challenging the Commissioner's decision. Dkts. 1-3.

## II.   JURISDICTION

Jurisdiction to review the Commissioner's decision exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## III.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala*,

REPORT AND RECOMMENDATION - 2

53 F.3d 1035, 1039 (9th Cir. 1995).  While the Court is required to examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  When the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld. *Id.*

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).  The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id*. at 1076-77; *see also Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## IV.   EVALUATING DISABILITY

As the claimant, Ms. Clifford bears the burden of proving that she is disabled within the meaning of the Social Security Act (the "Act"). *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (internal citations omitted).  The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment which has lasted, or is expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled under the Act only if her impairments are of such severity that she is unable to do her previous work, and cannot, considering her age, education, and work experience, engage in any other substantial gainful activity existing in the

national economy.  42 U.S.C. §§ 423(d)(2)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

The Commissioner has established a five step sequential evaluation process for determining whether a claimant is disabled within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof during steps one through four.  At step five, the burden shifts to the Commissioner.  *Id.*  If a claimant is found to be disabled at any step in the sequence, the inquiry ends without the need to consider subsequent steps.  Step one asks whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).[1]  If she is, disability benefits are denied.  If she is not, the Commissioner proceeds to step two.  At step two, the claimant must establish that she has one or more medically severe impairments, or combination of impairments, that limit her physical or mental ability to do basic work activities.  If the claimant does not have such impairments, she is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant does have a severe impairment, the Commissioner moves to step three to determine whether the impairment meets or equals any of the listed impairments described in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d).  A claimant whose impairment meets or equals one of the listings for the required twelve-month duration requirement is disabled.  *Id.*

When the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner must proceed to step four and evaluate the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the Commissioner evaluates the physical and mental demands of the claimant's past relevant work

---

[1] Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical and/or mental activities, and gainful, i.e., performed for profit.  20 C.F.R. § 404.1572.

to determine whether she can still perform that work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If

the claimant is able to perform her past relevant work, she is not disabled; if the opposite is

true, then the burden shifts to the Commissioner at step five to show that the claimant can

perform other work that exists in significant numbers in the national economy, taking into

consideration the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

404.1520(g), 416.920(g); *Tackett*, 180 F.3d at 1099, 1100.  If the Commissioner finds the

claimant is unable to perform other work, then the claimant is found disabled and benefits may

be awarded.

## V.     DECISION BELOW

On June 29, 2012, the ALJ issued a decision finding the following:

1. The claimant has not engaged in substantial gainful activity since August 13, 2010, the application date.

2. The claimant has the following severe impairments: anxiety disorder; cannabis dependence in remission; and alcohol dependence in remission.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand, remember, and carry out simple, routine tasks.  She can have superficial contact with the public, and work around coworkers, but is not able to interact as part of a team.

5. The claimant has no past relevant work.

6. The claimant was born on XXXXX, 1985 and was 25 years old, which in is defined as a younger individual age 18-49, on the date the application was filed.[2]

7. The claimant has limited education and is able to communicate in English.

---

[2]  The actual date is deleted in accordance with Local Rule CR 5.2, W.D. Washington.

REPORT AND RECOMMENDATION - 5

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.  The claimant has not been under a disability, as defined in the Social Security Act, since August 13, 2010, the date the application was filed.

AR at 24-32.

## VI.   ISSUES ON APPEAL

The principal issues on appeal are:

1.   Whether the ALJ properly evaluated the medical evidence?

2.   Whether the ALJ's step five analysis was correct?

Dkt. 14 at 1.

## VII.   DISCUSSION

A.   The ALJ Did Not Properly Evaluate the Medical Evidence

Plaintiff argues the ALJ erred by assigning more weight to the opinions of non-examining doctors than the examining and/or treating doctors, and also argues that the reasons given by the ALJ in rejecting the examining doctors' opinions were not specific and legitimate. Dkt. 14 at 10-13.

### 1.   Standards for Reviewing Medical Evidence

As a matter of law, more weight is given to a treating physician's opinion than to that of a non-treating physician because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes*, 881 F.2d at 751; *see also Orn v. Astrue*, 495 F.3d, 625, 631 (9th Cir. 2007).  A treating physician's opinion, however, is not necessarily conclusive as to either a physical condition or the ultimate issue of disability, and can be rejected, whether or not that opinion is contradicted. *Magallanes*, 881

F.2d at 751.  If an ALJ rejects the opinion of a treating or examining physician, the ALJ must give clear and convincing reasons for doing so if the opinion is not contradicted by other evidence, and specific and legitimate reasons if it is.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1988).  "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Id.* (citing *Magallanes*, 881 F.2d at 751).  The ALJ must do more than merely state his/her conclusions.  "He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988)).  Such conclusions must at all times be supported by substantial evidence.  *Reddick*, 157 F.3d at 725.

The opinions of examining physicians are to be given more weight than non-examining physicians.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Like treating physicians, the uncontradicted opinions of examining physicians may not be rejected without clear and convincing evidence.  *Id.*  An ALJ may reject the controverted opinions of an examining physician only by providing specific and legitimate reasons that are supported by the record.  *Bayliss*, 427 F.3d at 1216.

Opinions from non-examining medical sources are to be given less weight than treating or examining doctors.  *Lester*, 81 F.3d at 831.  However, an ALJ must always evaluate the opinions from such sources and may not simply ignore them.  In other words, an ALJ must evaluate the opinion of a non-examining source and explain the weight given to it.  Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *2.  Although an ALJ generally gives more weight to an examining doctor's opinion than to a non-examining doctor's opinion, a non-examining doctor's opinion may nonetheless constitute substantial evidence if it is

consistent with other independent evidence in the record. *Thomas*, 278 F.3d at 957; *Orn*, 495 F.3d at 632-33.

2.      *Discussion*

The ALJ discussed and either rejected or gave "little weight" to the medical opinions of examining and/or treating physicians, Drs. Anselm Parlatore, T. Christopher Portman, Kevin Zvilna, Ellen Walker Lind, and W. Douglas Uhl, in favor of the medical opinions of Drs. Christmas Covell and John Robinson, who were state agency psychological consultants who neither examined or treated plaintiff. AR at 29-31. Plaintiff argues the ALJ erred by doing so under the hierarchy of *Orn*, and also argues the ALJ erred by failing to give specific and legitimate reasons for rejecting the examining and/or treating doctors' opinions in favor of the non-treating non-examining doctors. Dkt. 14 at 10-13. The Court agrees with plaintiff. A discussion of the ALJ's errors with respect to each examining and/or treating physician is addressed below.

a.      Dr. Parlatore

On November 18, 2009, Dr. Anselm Parlatore, M.D. examined plaintiff regarding her mental impairments. AR at 224-27. Dr. Parlatore indicated that during the examination, plaintiff was "anxious and nervous and shaky and tremulous and timid and had a mood apprehension." AR at 226. The doctor further indicated plaintiff's "affect was a bit constricted, but she was cogent, coherent, lucid and logical and had a very pleasing demeanor." *Id*. The doctor further indicated "[t]here was no evidence of psychosis, hallucinations, paranoia or delusions" and "[o]n the cognitive exam, she was totally intact to memory, concentration, fund of information or abstraction. She remembered 4 out of 4 objects. Was able to do serial sevens, spell the word 'world' forward and backward, do digit span and retention, abstract proverbs, and discuss current events." *Id*. Dr. Parlatore diagnosed plaintiff

with panic disorder with agoraphobic features and alcohol abuse in sustained remission.  *Id.*

Dr. Parlatore assessed plaintiff a GAF[3] score of 50.  *Id.*  Ultimately, Dr. Parlatore concluded

that plaintiff's "psychiatric symptoms render her moderately too [sic] markedly in terms of

stress, focus, concentration, pace and persistence, but they don't affect her intellectually," and

that plaintiff is "cognitively intact," but that her "ability to carry out specific tasks in a timely

and consistent manner and her interaction with others is moderately to markedly impaired."

AR at 227.

On February 28, 2012, Dr. Parlatore submitted responses to written interrogatories

indicating plaintiff had generalized persistent anxiety and recurrent severe panic attacks,

moderate limitations in activities of daily living, moderate deficiencies of concentration,

persistence or pace, marked limitations in maintaining social functioning, and she often had

episodes of deterioration or decompensation.  AR at 355-57.

The ALJ gave Dr. Parlatore's opinion "no weight."  AR at 29.  The ALJ reasoned that

"Dr. Parlatore's limitations are vague" and "do not describe the most the claimant is capable of

doing."  *Id.*  The ALJ also stated "Dr. Parlatore does not describe or define what he means by

'moderate or markedly' impaired" and that Dr. Parlatore's opinion is also "inconsistent with

---

[3] The GAF score is a subjective determination based on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning."  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000).  A GAF score falls within a particular 10-point range if either the symptom severity or the level of functioning falls within the range.  *Id.* at 32.  For example, a GAF score of 51-60 indicates "moderate symptoms," such as a flat affect or occasional panic attacks, or "moderate difficulty in social or occupational functioning."  *Id.* at 34.  A GAF score of 41-50 indicates "[s]erious symptoms," such as suicidal ideation or severe obsessional rituals, or "any serious impairment in social, occupational, or school functioning," such as the lack of friends and/or the inability to keep a job.  *Id.*  A GAF score of 31-40 indicates "some impairment in reality testing and communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  A GAF score of 21-30 indicates "behavior is considerably influenced by delusions or hallucinations" or "serious impairment in communications or judgment" or "inability to function in all areas."  *Id.*

REPORT AND RECOMMENDATION - 9

1   his own examination findings, in which he indicated the claimant had intact memory,

2   concentration, persistence, and pace during the mental status examination," and his opinions

3   are also "inconsistent with the [plaintiff's] activities."  AR at 29-30.  Finally, the ALJ indicated

4   that "Dr. Parlatore appears to have relied heavily on the [plaintiff's] self-reports, which are not

5   entirely reliable" and the fact that Dr. Parlatore suggested that plaintiff "often" experiences

6   episodes of decompensation "suggests Dr. Parlatore is unfamiliar with the Agency ratings"

7   because there is no evidence plaintiff has never been hospitalized for psychiatric reasons.  AR

8   at 30.

9          The reasons the ALJ gave for dismissing Dr. Parlatore's opinion were not specific and

10   legitimate.  First, there is nothing indicating that Dr. Parlatore's limitations are vague.  Dr.

11   Parlatore, after doing a mental status examination, clearly indicated plaintiff was moderately to

12   markedly impaired with respect to concentration, pace and persistence, and moderately to

13   markedly impaired in dealing with stress, carrying out specific tasks in a timely and consistent

14   manner, and in interacting with others, among other things.  AR at 227.  There is nothing

15   vague about these or any other findings made by Dr. Parlatore.

16          Second, the ALJ erred in dismissing Dr. Parlatore's opinion on the basis that he did not

17   describe or define what he means by "moderate or markedly."  There is no reason to believe

18   Dr. Parlatore meant anything other than how the terms are defined by the Code of Federal

19   Regulations sections dealing with Social Security Benefits.  For example, 20 C.F.R, Pt. 404,

20   Subpt. P, App. 1, 12.00 Mental Disorders states:

21          C. Assessment of severity. We measure severity according to the functional
           limitations imposed by your medically determinable mental impairment(s). We
22          assess functional limitations using the four criteria in paragraph B of the
           listings: Activities of daily living; social functioning; concentration, persistence,
23          or pace; and episodes of decompensation. *Where we use "marked" as a*
           *standard for measuring the degree of limitation, it means more than moderate*
24          *but less than extreme. A marked limitation may arise when several activities or*

*functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.* See §§ 404.1520a and 416.920a.

*Id.* (emphasis added).  Moreover, it is curious that the ALJ apparently requires Dr. Parlatore to define these terms but later adopts Dr. Covell's use of these terms without question, even though Dr. Covell does not define these terms in his analysis.  *See* AR at 29, 247-48.

Third, there is nothing indicating that Dr. Parlatore relied heavily on the plaintiff's self-reports to come to his opinion.  While Dr. Parlatore did rely on some of plaintiff's statements (as will be the case in any psychological evaluation), there is nothing to indicate that his conclusions were primarily based on these statements.  Dr. Parlatore performed a mental status examination and performed various objective tests to measure plaintiff's memory, concentration, ability to think abstractly, and to determine her mood, in addition to generally observing symptoms of anxiety at the examination.  AR at 224-27.  Thus, the record indicates that Dr. Parlatore's opinions were formed by objective tests and observations during the examination and by accounting for plaintiff's subjective complaints.

Fourth, there is nothing indicating that Dr. Parlatore's opinion was "inconsistent with his own examination findings" or "inconsistent with the [plaintiff's] activities."  Dr. Parlatore found that while plaintiff was cognitively intact, she was "anxious and nervous and shaky and tremulous and timid and had mood apprehension" and that her "affect was a bit constricted" and that, in his opinion, she had severe panic disorder with agoraphobic features.  AR at 226.  Dr. Parlatore also found that while plaintiff does help doing housework and socializes with a small group of friends and a boyfriend, she doesn't go out in crowds because her panic disorder and anxiety severely limit her ability to function in crowds.  AR at 224.  As a result, Dr. Parlatore concluded that plaintiff has moderate restrictions in her daily activities,

1   concentration, persistence and pace, and marked limitations maintaining social functioning due

2   to her recurrent panic attacks.  AR at 356-57.  There is nothing inconsistent about these

3   findings.  Additionally, the fact that plaintiff does housework and socializes with a few friends

4   has little significance in this case.  The Ninth Circuit has "recognized that disability claimants

5   should not be penalized for attempting to lead normal lives in the face of their limitations."

6   *Reddick*, 157 F.3d at 722.  There is nothing to indicate that plaintiff's activities were anything

7   more than plaintiff trying to lead a normal life and do not contradict her statements that she

8   cannot work in environments where she is forced to interact with large numbers of people.

9          Finally, there is nothing indicating that Dr. Parlatore does not understand the Agency

10   ratings when he wrote that plaintiff "often" experiences episodes of decompensation.  *See* AR

11   at 357.  20 C.F.R, Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders, in discussing what it

12   means to have episodes of decompensation, states:

> 4. Episodes of decompensation are exacerbations or temporary increases in
> symptoms or signs accompanied by a loss of adaptive functioning, as
> manifested by difficulties in performing activities of daily living, maintaining
> social relationships, or maintaining concentration, persistence, or pace.
> Episodes of decompensation may be demonstrated by an exacerbation in
> symptoms or signs that would ordinarily require increased treatment or a less
> stressful situation (or a combination of the two).  Episodes of decompensation
> may be inferred from medical records showing significant alteration in
> medication; or documentation of the need for a more structured psychological
> support system (e.g., hospitalizations, placement in a halfway house, or a highly
> structured and directing household); or other relevant information in the record
> about the existence, severity, and duration of the episode.

13

14

15

16

17

18

19   Here, the fact that plaintiff exhibited recurrent severe episodes of panic attacks, which resulted

20   in her having increased difficulty being in large crowds, may be sufficient to show episodes of

21   decompensation.  Thus, none of the reasons the ALJ gave for assigning "no weight" to Dr.

22   Parlatore's medical opinion were specific and legitimate.

23

24

REPORT AND RECOMMENDATION - 12

1

                    b.      Dr. Portman

2

      On August 2, 2010, Dr. Portman, Ph.D examined plaintiff regarding her mental

3

impairments.  AR at 241-46.  Dr. Portman found plaintiff to be well groomed; oriented to time,

4

place, person and purpose; and entirely cooperative.  The doctor also noted plaintiff had a good

5

memory, relatively normal thought process, intact concentration, and was able think abstractly,

6

despite having questionable judgment.  AR at 246.  Although the doctor did not review any of

7

plaintiff's medical records and indicated that he did not observe any anxiety or panic episodes

8

at the examination, he diagnosed plaintiff with panic disorder.  AR at 242-43.  Dr. Portman also

9

found plaintiff to have mild limitations with respect to the abilities to exercise judgment, make

10

decisions, and perform routine tasks.  He diagnosed marked limitations with respect to the

11

ability to relate appropriately to co-workers and supervisors; interact appropriately in public

12

contacts; respond appropriately to and tolerate the pressures and expectations of a normal work

13

setting; and maintain appropriate behavior in a work setting.  AR at 244.  Dr. Portman assessed

14

plaintiff with a GAF score of 50.

15

      On February 27, 2012, Dr. Portman submitted responses to written interrogatories

16

indicating that in his opinion, plaintiff had generalized persistent anxiety and recurrent severe

17

panic attacks.  He also diagnosed plaintiff with marked limitations in activities of daily living;

18

concentration, persistence or pace; and social functioning, in addition to finding repeated

19

episodes of deterioration or decompensation.  AR at 321-22.  Dr. Portman further indicated

20

that he believed plaintiff's conditions resulted in "complete inability to function independently

21

outside the area of one's home."  *Id*.

22

      The ALJ gave Dr. Portman's medical opinion "little weight."  AR at 30.  The ALJ

23

rejected Dr. Portman's medical opinion because "Dr. Portman did not review any of the

24

claimant's records (5F1), provided very little explanation for his limitations (5F4), and relied

REPORT AND RECOMMENDATION - 13

on the claimant's statement that she 'fears panic if attempting to work with others' (5F4) as opposed to any objective medical evidence or findings." *Id*. Moreover, the ALJ stated that Dr. Portman's opinion was "vague in that he suggests the claimant 'appeared' to be unable to work because of her panic disorder (54F)" and that his findings were not supported by evidence because "he did not observe anxiety with panic symptoms during the evaluation (5F2)." *Id*. The ALJ also rejected Dr. Portman's February 27, 2012 responses to the written interrogatories because, according to the ALJ, Dr. Portman's finding that plaintiff's condition resulted in complete inability to function independently outside the area of one's home was inconsistent with the record; "Dr. Portman's opinion is based on a check-box form that provides no explanation of the basis for his limitations"; and the fact that Dr. Portman suggested that plaintiff has "repeated" episodes of decompensation suggests Dr. Portman is unfamiliar with the Agency ratings because there is no evidence plaintiff has never been hospitalized for psychiatric reasons. AR at 30.

The ALJ did not err. The ALJ is correct that Dr. Portman provided very little explanation for how he assessed plaintiff's limitations and how he reconciled his relatively mild findings stemming from the mental status examination with his conclusions. Dr. Portman's findings are even more questionable given the fact that he did not review any of the plaintiff's medical records nor did he observe any symptoms of anxiety or panic episodes during the examination, yet he diagnosed plaintiff with panic disorder. Dr. Portman's findings regarding anxiety, panic disorder, and ability to work as a result of these impairments would therefore appear to be based exclusively on plaintiff's statements. Because the ALJ found plaintiff to be less than credible, the ALJ provided specific and legitimate reasons to discount Dr. Portman's opinion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

c.      Dr. Zvilna

On February 14, 2011, Dr. Zvilna, Ph.D examined plaintiff regarding her mental impairments.  AR at 287-90.  Dr. Zvilna found plaintiff to have mild limitations due to "[l]abile, shallow, or coarse affect" and noted that plaintiff had trouble "understanding some questions" and had "[s]ome speech slurring."  AR at 286.  Moreover, Dr. Zvilna noted moderate limitations in the "[a]bility to understand, remember, and persist in tasks following simple instructions."  AR at 286-87.  Dr. Zvilna also observed symptoms of anxiety and diagnosed plaintiff with panic disorder without agoraphobia, chronic PTSD and cannabis dependence in partial remission.  *Id*.  Dr. Zvilna further noted severe limitations with the ability to communicate and perform effectively in a work setting with public contact, but found no limitations with respect to plaintiff's ability to learn new tasks, perform routine tasks without undue supervision, be aware of hazards and take appropriate precautions, and communicate and perform effectively in a work setting with limited public contact.  AR at 288.  Dr. Zvilna assessed plaintiff with a GAF score of 40.

On February 27, 2012, Dr. Zvilna submitted responses to written interrogatories indicating that in his opinion, plaintiff had generalized persistent anxiety, recurrent severe panic attacks, recurrent and intrusive recollections of a traumatic experience, marked to extreme limitations in social functioning, extreme limitations in maintaining social functioning, moderate limitations in concentration, persistence or pace, and repeated episodes of deterioration or decompensation.  AR at 314-19.  Finally, Dr. Zvilna indicated that it was his opinion that plaintiff's impairments impaired her ability to work.  AR at 319.

The ALJ gave Dr. Zvilna's medical opinion "little weight."  AR at 30.  The ALJ stated that Dr. Zvilna relied exclusively on the claimant's statements and alleged symptoms, which are not entirely reliable.  *Id*.  Moreover, the ALJ stated that Dr. Zvilna's opinion was

1    inconsistent with the record as a whole and, in particular, with plaintiff's various social

2    activities.  The ALJ also relied upon the observations of her treatment providers that plaintiff

3    appeared to have "rehearsed" her anxiety symptoms during some of her examinations.  *Id.*

4    Additionally, the ALJ indicated that Dr. Zvilna was unreliable because "other professionals

5    have noted Dr. Zvilna 'has a tendency towards low ratings.'"  *Id.*  Finally, the ALJ rejected Dr.

6    Zvilna's February 27, 2011 responses because according to the ALJ, "Dr. Zvilna simply

7    completed a check-box form without providing any explanation or basis for his suggested

8    limitations" and the fact that Dr. Zvilna suggested that plaintiff has "repeated" episodes of

9    decompensation suggests Dr. Zvilna is unfamiliar with the Agency ratings because there is no

10   evidence plaintiff has never been hospitalized for psychiatric reasons.  *Id.*

11          The reasons the ALJ gave for dismissing Dr. Zvilna's opinion were not specific and

12   legitimate.  First, there is nothing indicating that Dr. Zvilna's opinions were based exclusively

13   on claimant's statements.  Here, unlike the observations of Dr. Portman, Dr. Zvilna actually

14   observed plaintiff with symptoms of anxiety, slurred speech, flat affect, and inability to

15   understand some questions.  Based on these observations and plaintiff's statements regarding

16   her impairments, Dr. Zvilna diagnosed plaintiff with panic disorder and chronic PTSD.

17          Second, as mentioned above, there is nothing to indicate that plaintiff's daily activities

18   are inconsistent with her alleged symptoms.  *See supra* Part VII(A)(2)(a).

19          Third, while one medical provider did indicate that plaintiff's "anxiety appears to be

20   somewhat rehearsed and becomes more noticeable when discussed" (*see* AR at 360), the

21   record as a whole does not indicate that plaintiff's anxiety was "rehearsed," and all the treating

22   and examining physicians who examined the plaintiff, found her symptoms to be very credible

23   and assessed serious limitations based on their examinations of plaintiff's impairments.  *See*

24   Part VII(A)(2)(a)-(b), *supra*; Part VII(A)(2)(d)-(e), *infra*.

REPORT AND RECOMMENDATION - 16

1      Fourth, the ALJ's statement that "other professionals have noted Dr. Zvilna 'has a

2   tendency towards low ratings'" was an error in the interpretation of the medical record, and it

3   was improper for the ALJ to discredit Dr. Zvilna on this ground.  The statement comes from

4   plaintiff's DSHS Social Services Case Notes, which are mere summaries of plaintiff's medical

5   files.  A review of the entire paragraph the statement comes from reads:

6          Printed in Incapacity Decision (14-118) approval.  t/c with Jim T of SeaMar
           (counselor) he had r/o PTSD with Panic Disorder.  Reports multiple life traumas
7          in her life.  She is working only on her GED Math at this time.  Per additional
           recommendations from Jim, prudent for adjustment to MH eval for additional
8          approval.  Dr. Zvilna also has tendency toward low ratings.

9   AR at 297.  The statement is ambiguous.  It is not clear if the writer believes Dr. Zvilna

10  regularly gives patients low ratings as a general matter or if this is relative to a specific doctor

11  treating plaintiff.  In addition, is it not clear what the term "low ratings" means.  Moreover,

12  even if the ALJ's interpretation of this note is correct, it is completely improper for an ALJ to

13  discount a medical opinion on the basis of a "perception" of unnamed evaluators.

14      Finally, the ALJ's conclusion that Dr. Zvilna's February 27, 2011 findings should be

15  disregarded because they are only "check the box" opinions without any support was improper.

16  As mentioned above, Dr. Zvilna examined plaintiff on February 14, 2011, filled out a

17  psychological evaluation, performed various mental examination tests and noted his findings.

18  In his February 27, 2011 answers to written interrogatories, Dr. Zvilna noted he checked the

19  boxes for the interrogatories based on his findings during his examination on February 14,

20  2011.  AR at 317.  Thus, Dr. Zvilna's February 27, 2011 answers were not merely "check the

21  box" opinions and were based on the medical examination and tests given by Dr. Zvilna on

22  February 14, 2011.

23

24

REPORT AND RECOMMENDATION - 17

1

    d.  Dr. Lind

2

   On January 25, 2012, Dr. Lind, Ph.D examined plaintiff regarding her mental

3

impairments.  AR at 311-13.  Dr. Lind found plaintiff to be cooperative and able to articulate

4

herself well, had no indication of hallucinations or delusional experiences, had a clear and

5

organized stream of mental activity, was well oriented, and had good long term memory but

6

found plaintiff's short term memory is poor when she is anxious.  Dr. Lind, however, observed

7

symptoms of anxiety during the examination and diagnosed plaintiff with PTSD with

8

agoraphobia.  *Id*.  Dr. Lind assessed plaintiff with a GAF of 44.  AR at 312.

9

   The ALJ gave Dr. Lind's opinion "little weight."  AR at 31.  The ALJ stated that

10

"[a]lthough Dr. Lind assigned the claimant a score of 44 on the [GAF] scale, (16F2), her

11

opinion is vague in that she does not include any specific discussion of the most the claimant is

12

capable of doing" and "she does not include any explanation of the basis for her GAF score,

13

and simply notes the claimant is unemployed and living with her mother (16F2)."  *Id*.

14

   While it is true that Dr. Lind does not provide extensive narrative discussion in her

15

report, her findings and diagnosis are consistent with those of Drs. Parlatore, Zvilna, and Uhl,

16

in that all indicated plaintiff exhibited symptoms of anxiety and each diagnosed plaintiff with

17

anxiety, depression, and/or PTSD.  Thus, nothing indicates that Dr. Lind's opinions or findings

18

are vague or inconsistent with the record.

19

   Moreover, consistent with other treating or examining doctors, Dr. Lind assessed

20

plaintiff a very low GAF score.  *See* AR at 226 (Dr. Parlatore assessing GAF of 50), 243 (Dr.

21

Portman assessing GAF of 50), 286 (Dr. Zvilna assessing GAF of 40).  In situations such as

22

this, where almost all the treating or examining doctors assessed plaintiff a low GAF score, it is

23

wrong for an ALJ to dismiss a treating doctor's low GAF score merely because the doctor does

24

not provide a detailed explanation of that GAF score.  *See also Chance v. Colvin*, No. C13–

1  1516–TSZ, 2014 WL 3507587, at *7 (W.D. Wash. Jul. 14, 2014) ("In light of these

2  consistently low GAF scores by various medical sources who examined plaintiff, the ALJ erred

3  by not addressing how to reconcile the low GAF scores with the finding that plaintiff is not

4  disabled . . . ."); *Woodsum v. Astrue,* 711 F. Supp. 2d 1239, 1254-55 (W.D. Wash. 2010)

5  (holding that in reviewing medical opinions, an ALJ cannot simply ignore a GAF score below

6  45).

7                              e.      Dr. Uhl

8         On June 23, 2009, Dr. Uhl, Psy.D examined plaintiff regarding her mental impairments.

9  AR at 344-54.  With respect to functional mental disorder, Dr. Uhl found plaintiff to have

10 marked limitations due to verbal expression of anxiety or fear, moderate limitations due to

11 social withdrawal and motor agitation, and mild limitations due to expression of anger.  AR at

12 346.  With respect to cognitive factors, Dr. Uhl found plaintiff to have moderate limitations

13 with the ability to exercise judgment and make decisions, and have mild limitations in the

14 ability to learn new tasks and perform routine tasks.  AR at 347.  With respect to social factors,

15 Dr. Uhl found plaintiff to have marked limitations in the ability to respond appropriately to and

16 tolerate the pressure and expectations of a normal work setting, moderate limitations in the

17 ability to relate appropriately to co-workers and supervisors and ability to control physical or

18 motor movements and maintain appropriate behavior, and mild limitations with the ability to

19 interact appropriately in public contacts.  Dr. Uhl ultimately determined that "[t]his woman can

20 obtain employment . . . but cannot keep it because of her anxiety."  *Id.*  Dr. Uhl diagnosed

21 plaintiff with panic disorder without agoraphobia and alcohol dependence in remission.  AR at

22 346.

23         The ALJ gave Dr. Uhl's medical opinion "little weight."  AR at 31.  The ALJ stated

24 that Dr. Uhl did not reference any records and "relie[d] on the claimant's self-reports, which

REPORT AND RECOMMENDATION - 19

1    are not entirely reliable . . . ." *Id*. Moreover, the ALJ stated that Dr. Uhl's limitations were

2    "inconsistent with the record as a whole, and in particular with plaintiff's activities of daily

3    living." *Id*.

4         The reasons the ALJ gave for dismissing Dr. Uhl's opinion were not specific and

5    legitimate. A review of Dr. Uhl's report indicates that he administered various objective tests

6    and noted his findings on the basis of these tests. AR at 349-54. Thus, nothing supports the

7    ALJ's finding that Dr. Uhl's opinion was substantially based on plaintiff's self reports.

8    Moreover, as mentioned above, there is nothing to indicate that plaintiff's daily activities are

9    inconsistent with her alleged symptoms, as opposed to attempts by plaintiff to lead a normal

10   life.

11        In light of all the objective evidence, the ALJ should not have given the opinions of the

12   non-examining/non-treating doctors more weight than those of the examining and treating

13   doctors, especially when virtually all of the examining and/or treating doctors concluded that

14   plaintiff was credible and has serious mental impairments. *See Magallanes*, 881 F.2d at 751

15   ("We afford greater weight to a treating physician's opinion because 'he is employed to cure

16   and has a greater opportunity to know and observe the patient as an individual.'"). The ALJ

17   essentially disregarded all opinions from physicians who saw and treated plaintiff, in favor of

18   those who never saw or treated plaintiff. This cannot be squared with the holding in *Orn*. *Orn*,

19   495 F.3d at 631.

20        B.    <u>The ALJ Should Reevaluate the RFC and Redo the Step Five Analysis</u>

21        Plaintiff argues that the ALJ's step five analysis was incorrect. Because this Court has

22   determined the ALJ erred in evaluating the medical evidence, the step five arguments will not

23   be addressed. Rather, this case will be remanded this case back to the ALJ for a proper

24

REPORT AND RECOMMENDATION - 20

assessment of the medical evidence, and a reevaluation of the RFC.  The ALJ will redo the step five analysis based on this reevaluation.

VIII.   CONCLUSION

For the foregoing reasons, the Court recommends that this case be REVERSED and REMANDED to the Commissioner for further proceedings not inconsistent with the Court's instructions.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **September 4, 2014**.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **September 5, 2014**.

DATED this 21st day of August, 2014.

*James P. Donohue*
_____
JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION - 21